(e)     Trading volumes reflected in accounts were vastly in excess of actually reported trading values. A report issued by Bloomberg estimated that the strategy would have required at least ten times the S&P option contracts that trade on the U.S. exchanges.

92.     Despite all of the red flags described above, Defendants entrusted Madoff with more than $3 billion of the Class's assets – and collected their corresponding management or administration fees – for over a decade, without conducting the reasonable due diligence to which Plaintiffs and the Class were entitled, and without informing Plaintiffs and the Class that their assets had been invested with Madoff.

93.     Defendants' actions with respect to Plaintiffs and the Class's assets fell far short of the legal duties owed, and representations made, to Plaintiffs and the Class both before and after their money had been invested in Optimal SUS. Indeed, five months after having declared, "[i]f you don't fully understand an instrument, don't buy it" and "[i]f you would not buy for yourself a specific product, don't try to sell it," Banco Santander admitted that it had lost over EUR 2.33 billion (or $3.3 billion) of its clients' money to a massive Ponzi scheme. Most of this money belonged to members of the Class. According to *The Wall Street Journal*, this amount accounted for "by far the largest reported at a single bank," and represented almost a quarter of the losses suffered by European investors as a whole to Madoff's Ponzi scheme. In light of these staggering losses, and in response to reports of the Echenique/Madoff meeting in late November 2008 (described below), Spanish prosecutors have opened an investigation into the relationship between Banco Santander and BMIS.

94.     Defendants were aware, or absent gross negligence or recklessness, should have been aware, of the many red flags described above. They knew, or absent gross negligence or recklessness, should have known, that Madoff's investment holdings and returns had not been

properly verified, and that the capital of Plaintiffs and the Class was not being safeguarded by a reliable custodian, or overseen by a reliable auditor. Rather than investigate obvious red flags, Defendants acted out of their own self-interest in accumulating capital that generated lucrative management and/or administration fees, and did not act in good faith.

95.    By failing to investigate and acting in willful blindness towards these clear red flags and the suspicious nature of Madoff's operations and investment results, Defendants breached their fiduciary duties to Plaintiffs and the members of the Class, and enabled Madoff to plunder the capital that they had invested with Optimal SUS, thereby injuring Plaintiffs and the Class.

## IV.    Rather Than Perform Any Due Diligence Into Madoff's Demonstrably Fraudulent Investment "Strategy," Defendants Both Excused And Praised It While Collecting Substantial Fees.

96.    Rather than question Madoff's impossible strategy or, it turns out, even attempt to understand it, Defendants attempted to both take credit for the strategy and justify its lack of transparency, all while collecting substantial fees for providing services of little or no value to Plaintiffs or the Class.

97.    As stated above, the Memorandum stated "*the fund's strategy* used by the Broker-Dealer, involving split-strike conversions . . . is a unique investment program, and is often not well followed by the Wall Street community. Accordingly, there is very little independent data available to assist a prospective investor in his analysis of the fund." (emphasis added). This statement was materially misleading for several reasons, including but not limited to the following:

(a)    First, the split-strike conversion strategy was described as belonging to "the fund" and merely being "used" by the Broker-Dealer. In truth, the purported "strategy" was Madoff's alone and was used by him as a front to his Ponzi scheme.

(b)    Second, by stating generally that the strategy was "often not well followed" by "the Wall Street community," and that there was little independent data for a "prospective investor" (such as members of the Class) to analyze the fund, the Memorandum implied that at least the Santander Defendants themselves were equipped to analyze the fund's strategy. Investors such as Plaintiffs and the Class had no reason to suspect that even the Santander Defendants did not understand, indeed had not even attempted to analyze, the fund's purported "strategy."

(c)    Third, and most fundamentally, the "fund" was not using the split-strike conversion strategy nor indeed any other kind of investment strategy – rather, it was simply part of a Ponzi scheme.

98.    Rather than conduct the due diligence to which Plaintiffs and the Class were entitled, as recently as October 2008 (the date of the attached Memorandum) the Santander Defendants remarkably sought to disclaim responsibility if the information Madoff gave to them proved to be fabricated, or if Madoff proved to be little more than a thief. The Memorandum contained the following clause, which related *solely* to Optimal SUS:

> [T]here is the risk that the Broker-Dealer could abscond with those assets. There is always the risk that the assets with the Broker-Dealer could be misappropriated. In addition, information supplied by the Broker-Dealer may be inaccurate or even fraudulent. The Investment Manager and the Administrator are entitled to rely on such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.

Ex. 1 at 33

99.    This statement was also materially misleading for several reasons, including but not limited to the following:

(a)     First, under the International Standards on Auditing that applied to the Optimal Funds' financial statements, the Santander Defendants simply could not disclaim any and all duties to perform due diligence or implement internal controls with respect to the information supplied to them by Madoff. ISA (UK and Ireland) 240.15 provides that "[i]t is the responsibility of those charged with governance of the entity to ensure, through oversight of management, that the entity establishes and maintains *internal control* to provide reasonable assurance with regard to reliability of financial reporting . . . and compliance with applicable laws and regulations." (emphasis added).

(b)     Second, even assuming that the Santander Defendants could disclaim their fiduciary duties, this clause did not relieve the Santander Defendants of the responsibility, among other things, to (i) conduct due diligence independent of the information supplied by Madoff, or (ii) obtain information about Madoff from third parties. Moreover, the mere fact that the Memorandum pointed out the "risk" that the assets of Plaintiffs and the Class could be stolen outright does not absolve Defendants of responsibility for their breaches of duty that allowed this to happen.

(c)     Third, the existence of the many red flags discussed above means that Defendants did not rely, and simply could not have relied, on the information provided to them by BMIS "in good faith," making this purportedly exculpatory clause inapplicable.

100.    Their purported exculpatory clause notwithstanding, the Santander Defendants continued to praise Madoff's "impeccable" performance virtually up until the moment Madoff confessed that his investment activities were a sham. In late November 2008, or mere weeks before Madoff's Ponzi scheme was revealed, according to *The Wall Street Journal* article dated January 13, 2009, Botin sent "one of his chief lieutenants . . . Rodrigo Echenique

['Echenique'], who has been close to Mr. Botin for many years" to meet with Madoff in his New York offices. According to a *Financial Times* article dated January 23, 2009, what happened during that meeting is "disputed," although a banker "with knowledge of the meeting" described it as "a 'routine' inspection" that resulted in Banco Santander remaining satisfied that BMIS was solvent. The Spanish publication *El Mundo* reported on December 18, 2008, meanwhile, that Echenique's visit was prompted by "rumors about the possible problems" at BMIS which had been "going around for a few months in a small number of Santander's offices," and noted the abrupt departures of several high-level executives of Optimal Investments in June 2008, including the CEO. Regardless of the "rumors," *El Mundo* reported that Banco Santander's delegation purportedly "returned to New York with a complete report that theoretically removed any doubt about the solvency" of BMIS.

101.    During the same time-frame, in a presentation entitled "3rd Quarter - Portfolio Analysis," Optimal Investments stated to investors that Madoff's "market timing was *impeccable* during the recent period, as he was able to find great entry and exit points to benefit investors," and that "the current volatile environment continues to provide many opportunities for the strategy [of Optimal SUS] to outperform its equity index benchmark." (emphasis in original).

102.    Defendants' positive statements aside, the timing of Echenique's visit to Madoff in late November 2008 raises questions as to whether the Santander Defendants were growing concerned about the health of the Optimal Funds. Indeed, just months prior, in June 2008, Optimal Investments' CEO (Echeverria) and five other top executives left Optimal Investments for another Geneva-based wealth management company. According to an article in *The Wall Street Journal* dated January 13, 2009, Echeverria and the other executives reportedly

cited Banco Santander's efforts to sell its asset-management business – which included Optimal Investments – the previous year. According to the January 13, 2009 article, Banco Santander's effort to sell its asset management business failed when Banco Santander failed to find a buyer.

103. Indeed, that Banco Santander failed to find a buyer is unsurprising, considering that Madoff refused to allow any prospective purchasers to conduct due diligence of his operations. According to a December 19, 2008 article in *The Wall Street Journal*, another prominent (and, until December 11, 2008, highly successful) investment manager that invested billions of dollars with Madoff – Fairfield Greenwich Group ("Fairfield") – similarly failed to find a purchaser of a stake in its asset management business after prospective purchasers were told that "Madoff wouldn't allow prospective investors to view his books." This red flag was echoed in Markopolos November 7, 2005 submission to the SEC:

> . . . Madoff does not allow outside performance audits. One London based hedge fund. . . asked to send in a team of Big 4 accountants to conduct a performance audit during their planned due diligence. They were told "No, only Madoff's brother-in-law who owns his accounting firm is allowed to audit performance for reasons of secrecy in order to keep Madoff's proprietary trading strategy secret so that nobody can copy it."

104. To the extent that the timing of either Echenique's visit to Madoff in late November 2008 or the abrupt departures of Echeverria and other top executives from Optimal Investments were the result of any concerns on the Santander Defendants' part as to either the solvency of BMIS or the validity of Madoff's investment strategy and performance, those concerns remained hidden from investors prior to December 11, 2008, and have remained so.

105. As stated above, the Santander Defendants and the Administrator received handsome fees from Plaintiffs and the Class in exchange for providing services of little or no value. Specifically, the Memorandum set forth the fee schedule by which certain of the Defendants were compensated for their services, as follows:

(a)    An annual investment management fee charged by Optimal Investments of 2.15% of the NAV of the shares for Class A shares, 1.65% for Class B shares, and 1.15% for Class C shares. Ex. 1 at 30.

(b)    A fee to the Administrator of "2.5 basis points subject to a maximum of USD 200,000 per annum per account." The Administrator was "also entitled to charge an investment service fee of USD 35 per transaction." Ex. 1 at 12.

106.    All told, Optimal Investments received a weighted average annual commission of 1.90% of assets under management, or approximately EUR 44 million (or $60 million) annually from investors in Optimal SUS. These fees in turn accrued to Banco Santander as head of the Santander Group and were reported as "Fee and commission income" in Banco Santander's consolidated income statement. Banco Santander's private banking business, which included Santander International in the United States, and which marketed the Optimal Funds to investors, generated a EUR 445 million profit for Banco Santander in 2007.

**V.    The Optimal Funds' Investors Learned Of Madoff Only After His Arrest.**

107.    On December 11, 2008, Madoff was arrested by federal prosecutors and charged with operating what he told his sons and investigators was a massive, long-running Ponzi scheme. According to federal charges, and admitted by Madoff, BMIS fraudulently reported steady, positive returns on billions of dollars in "investments" purportedly being made with investors' assets – including those placed in his custody by Optimal Investments – when, in fact, BMIS had been insolvent for years.

108.    The same day, the SEC filed an emergency action to halt all ongoing fraudulent activities by Madoff and BMIS. That action is *SEC v. Bernard L. Madoff,* 08 Civ. 10791-LLS (S.D.N.Y. Dec. 11, 2008).

799960.2

109.    Banco Santander issued a press release on December 14, 2008, in response to Madoff's arrest. That press release revealed to investors, for the first time, that BMIS was the Broker-Dealer for Optimal SUS, and that Optimal SUS was entirely invested with Madoff.

110.    Almost immediately after Madoff's arrest, the net asset value ("NAV") of investors' shares of the Optimal Funds was reduced to zero. Banco Santander revealed that its clients' exposure to Madoff through the Optimal Funds was approximately EUR 2.33 billion (USD $3.1 billion). These are by far the largest reported losses from investors at a single bank. In contrast, Banco Santander itself only lost EUR 17 million in Madoff-related investments.

111.    On December 15, 2008, the Board of Directors of Optimal Multiadvisors suspended all redemptions and calculations of NAV in Optimal SUS, effective December 1, 2008.

112.    After the disclosure of Madoff's massive Ponzi scheme and its calamitous effects on Optimal SUS, Optimal Investments took its website offline. When the website returned, the language that had previously touted Optimal Investments' "intensive due diligence" of the investment managers with whom it chose to invest had been removed.

113.    Shortly after Madoff's arrest, a trustee (the "SIPC Trustee") was appointed to investigate the alleged trading activities of BMIS and to oversee its liquidation under the Securities Investor Protection Act, or SIPA. In a question and answer session on February 20, 2009 with investors injured by Madoff's Ponzi scheme, the SIPC Trustee revealed that a review of BMIS' records indicated that BMIS and Madoff had conducted *absolutely no trades* with investors' assets for at least the past thirteen years, which encompasses the entire span of the Optimal Funds' existence. What the SIPC Trustee told Madoff's investors, as reported in the

*New York Law Journal* on February 23, 2009, was this: "There wasn't any stock bought or sold. It was all just made up. You got somebody else's money."

114.   The SIPC Trustee's findings were subsequently confirmed by Madoff's guilty plea on March 12, 2009. According to prosecutors, and admitted by Madoff, since at least the early 1990s, BMIS did not purchase securities with the money over which it had custody (including the assets of the Optimal Funds), but instead simply deposited that money – billions of dollars worth – into an account at Chase Manhattan Bank (now J.P. Morgan Chase) in New York, New York (the "Chase account"), from which BMIS simply paid out redemptions to investors. These funds were occasionally transferred to a London firm owned and operated by Madoff in order to make it appear (falsely) that BMIS was executing trades in European markets, but it was then transferred back to the Chase account in order pay off earlier investors and to pay part of BMIS' overhead.

115.   Accordingly, for the duration of the Optimal Funds' existence, Madoff and BMIS did nothing more than collect cash and pay redemptions to investors, along with substantial fees to themselves, the Administrator, Optimal Investments and, in turn, Banco Santander, directly out of the principal invested by Plaintiffs and the Class.

## VI.   Banco Santander's "Exchange Offer."

116.   Since late January 2009, in presumed response to the public outcry over the massive losses incurred by its clients, most of whom had never heard of Madoff prior to December 10, 2008, Banco Santander has been offering to "exchange" certain Class members' shares in the Optimal Funds for, according to *Barron's*, "illiquid preferred stock worth a small fraction of their original investment, with no compensation for money-management fees or the supposed investment gains that Santander had reported year after year."

117.    Although the face value of the "preferred securities" are purportedly equal to the value of certain Class members' original investments in Optimal SUS, they are subject to a host of limitations.  First, on their face, the preferred securities do not offer to compensate Class members for any interest or gain their money would have earned had it been prudently invested.  Second, the preferred securities pay only a 2% yield that is not compounding and is not even obligatory should Banco Santander be unable to afford to pay it in any given year.  Third, there is no obligation on Banco Santander's part to ever "call" (i.e., buy back) the preferred securities, and the issue is "perpetual," meaning investors can never redeem the securities.  Fourth, there is currently no market for the preferred securities.  Fifth, if and when there is a market for the preferred securities, investors cannot transfer any rights associated with the preferred securities (i.e., sell them) without the prior consent of Banco Santander.  Sixth, Class members who accept Banco Santander's offer must promise not to sue the bank and to keep all their accounts at Banco Santander and not transfer them to another bank.  Finally, Banco Santander's offer does not apply to institutional investors or to indirect investors such as Plaintiffs Martin or Balmica Gestion, who invested in structured products offered by Banco Santander that in turn invested in Optimal SUS or the Optimal SUS Ireland Funds.

118.    According to a February 17, 2009 article in *The Wall Street Journal*, the Bank recently has also offered to allow some affected customers to use the preferred securities as collateral for loans for up to 85% of the value of their initial investments in Optimal SUS, charging 3% annual interest.  Importantly, however, the Bank remains unrequired to "call" the preferred securities, meaning that any investor who accepts such a loan remains fully responsible for paying it back, when it comes due, out of his or her own money.

119.    As if in acknowledgement of the foregoing limitations, among others, Banco Santander has announced that it is creating reserves for the costs of the preferred securities at only 36% of their purported face value.  In reality, the preferred securities may be worth next to nothing, particularly when one takes into account (a) the likelihood of the costs of inflation outpacing the preferred securities' 2% non-compounding (and non-obligatory) yield and (b) the non-transferability of the securities, among other things.

120.    In order to coerce Class members into accepting these onerous and unreasonable terms, Banco Santander has been meeting with Class members in person and engaging in what *The Wall Street Journal* calls "high-pressure tactics."  According to the *Journal*, some Class members have been given only 48 hours to accept Banco Santander's offer, while others have been given as little as six hours to decide.  Yet others have been told by their Bank representative that if they reject the offer, then Banco Santander's lawyers will take over their accounts.  At least one Bank customer was told to sign it by his Bank representative and, after doing so, was refused a copy of the agreement *he had just signed* because, according to the Bank representative, the terms were "confidential."

121.    According to the Bank's own statistics, its high-pressure tactics have worked.  If the Bank is to be believed, 85% of the Bank's non-institutional investor clients have accepted the exchange offer and, effective March 31, 2009, the Bank will become the "owner" of these investors' shares of Optimal SUS, and all the rights and obligations that attach thereto, including the right to sue third parties (such as PwC) for the losses incurred as a result of the Madoff Ponzi scheme.

## VII.    PricewaterhouseCoopers' Audits Failed To Meet Applicable Accounting Standards.

122.    Defendant PwC performed its work as auditors of the annual financial statements for Optimal Multiadvisors and Optimal Multiadvisors Ireland plc, the parent funds to

Optimal SUS and the Optimal SUS Ireland Funds (or "Parent Funds"), in a reckless manner inconsistent with the standards of the auditing profession and as required by IFRS (defined below).

123.    PwC either knew of or recklessly disregarded, among other things: (a) the concentration of the Optimal Funds' investments in a single third party investment manager, Madoff; (b) the materially heightened risk to the Optimal Funds' assets from such reliance on Madoff, particularly given the lack of transparency of Madoff' s operations; (c) the abnormally high and stable positive investment results reportedly obtained by Madoff; (d) the inconsistency between BMIS' publicly available financial information concerning its assets and the purported amounts that Madoff managed for clients such as Optimal SUS; and (e) the fact that BMIS itself was audited by a small, obscure accounting firm, Friehling & Horowitz, which has its offices in Rockland County, New York and had no experience auditing entities of the apparent size and complexity of BMIS.

124.    In conducting its audits of the Parent Funds, PwC pledged to abide by auditing standards issued by the Auditing Practices Board applicable in Ireland, otherwise known as the International Standards on Auditing ("ISAs") (UK and Ireland).

125.    In its annual audit reports, PwC represented that it examined evidence supporting the amounts and disclosures in the financial statements of the Parent Funds, and that its audits provided it with a reasonable basis to conclude that the financial statements were not materially misstated. For example, in the 2003 Annual Report for Optimal Multiadvisors Ireland plc, PwC stated the following:

> We planned and performed our audit so as to obtain all the information and explanations which we considered necessary in order to provide us with sufficient evidence to give reasonable assurance that the Financial

Statements are free from material misstatement, whether caused by fraud or other irregularity or error.

126.    These statements were false, as PwC's audits did not conform to applicable auditing standards.  Had PwC not recklessly violated these auditing standards, it would have discovered the fraudulent information underlying the Parent Funds' false and misleading financial statements. In truth, the quarterly and annual reports from Optimal Multiadvisors and Optimal Multiadvisors Ireland plc misrepresented the actual returns, assets under management, and losses or liabilities of the Optimal Funds.  The reports were also incomplete in that they failed to disclose the lack of internal controls and lack of evidence to support the stated financial results.

127.    The ISAs (UK and Ireland) are based on International Standards on Auditing of the same title (otherwise referred to as International Financial Reporting Standards, or "IFRS") which have been issued by the International Auditing and Assurance Standards Board (also known as the International Accounting Standards Board) ("IASB") and published by the International Federation of Accountants ("IFAC").

128.    The IASB describes itself in its marketing literature as an "independent standard-setting board, appointed and overseen by a geographically and professionally diverse group of Trustees (the 'IASC Foundation') who are accountable to capital market authorities and to the public interest."  The IASB's stated goal is "[t]o provide the world's integrating capital markets with a common language for financial reporting." (IASB website, 2009).

129.    Samuel DiPiazza ("DiPiazza") is one of the Trustees who oversees the IASB.  Since 2002, DiPiazza has also served as the Chief Executive Officer of PwC, and works out of PwC's main executive offices in New York.

130.    The IFAC is a global organization for the accountancy profession, with members and associates in 122 countries.  IFAC's stated mission is ". . . to strengthen the worldwide accountancy profession and contribute to the development of strong international economies by establishing and promoting adherence to high-quality professional standards [and] furthering the international convergence of such standards . . ." (IFAC website, 2008).

131.    The U.S. members of the IFAC are the American Institute of Certified Public Accountants ("AICPA").  The AICPA was a charter member of the International Accounting Standards Committee, the predecessor of the IASB.  In the U.S., the AICPA works in conjunction with the Financial Accounting Standards Board ("FASB") to establish Generally Accepted Accounting Principles ("GAAP").  According to Congressional testimony from late 2007, the AICPA "supports the goal of a single set of high-quality, comprehensive accounting standards to be used by public companies in the preparation of transparent and comparable financial reports throughout the world."  Testimony of Charles E. Landes, Vice-President, Professional Standards and Services, AICPA, Before the Committee on Banking, Housing and Urban Affairs of the U.S. Senate Subcommittee on Securities, Insurance and Investment, Oct. 24, 2007 ("AICPA Testimony").  According to that testimony, the AICPA supports "the larger goal of a single set of high quality, comprehensive accounting standards to be used by public companies in the preparation of transparent and comparable financial reports throughout the world."  *Id.*

132.    In 2002, FASB and IASB agreed on a plan to achieve "short term convergence" between the ISAs (or IFRS) and GAAP.  PwC has been at the forefront of this planned convergence.  DiPiazza recently stated the following in PwC's "Global Annual Review 2008":

> During the past ten years, we [PwC] have also helped to guide the emergence of a single set of International Financial Reporting Standards (IFRS) that meet the needs of global business. I have been closely involved in this issue as a Trustee of the International Accounting Standards Committee Foundation, the oversight body for the International Accounting Standards Board. PwC has long advocated a single set of global standards, and, with the U.S. about to come on board with IFRS, this goal is well on the way to being realised.

133.    IFRS require that an auditor exercise due professional care in performing an audit and in preparing the audit report. IFRS also require that each audit be planned and performed with an attitude of professional skepticism recognizing the possibility that a material misstatement in the financial reports due to fraud for the Parent Funds could exist. ISA (UK and Ireland) Sections 200.6, 240.23. Throughout PwC's audits of the Parent Funds prior to December 10, 2008, PwC failed to exercise due professional care, which rendered its audits materially deficient. PwC failed to adhere to professional auditing standards by, among other things:

(a)    failing to understand the Parent Funds' internal control structure sufficiently;

(b)    failing to obtain sufficient competent evidential matter;

(c)    failing to amend their audit procedures to take into consideration related party transactions;

(d)    failing to conduct an effective confirmation process; and

(e)    failing to extend its audit procedures in light of the warning signs of fraud.

134.    *PwC failed to assess internal controls.* IFRS required PwC to assess the internal accounting and reporting controls at the Parent Funds as an integral part of performing its audits of these funds. ISA (UK and Ireland) Section 315, *Understanding the Entity and its*

*Environment and Assessing the Risks of Material Misstatement,* requires an auditor to obtain an understanding of internal controls sufficient to plan an effective audit. PwC knew that the amounts and disclosures in the financial statements for the Parent Funds were reliant on internal accounting and reporting controls being carried out by entities other than these funds.

135.    For example, the Parent Funds were relying on the following internal controls being in place and operating effectively, among others, at various other entities:

(a)     the internal controls designed and implemented by the Investment Manager (Optimal Investments) and Administrator (HSBC Securities) in monitoring the ongoing activities of the Broker-Dealer (*i.e.,* Madoff) for Optimal SUS;

(b)     the internal controls designed and implemented by the Investment Manager and Administrator to confirm Optimal SUS' trading activity;

(c)     the internal controls designed and implemented by the Broker-Dealer (BMIS/Madoff) over the purchase and sale of securities;

(d)     the internal controls designed and implemented by Optimal SUS' custodian (*i.e.,* BMIS) to confirm trading activity, the receipt and disbursement of cash and security positions, and the physical security of cash and portfolio positions; and

(e)     the internal controls designed and implemented by Optimal SUS' Administrator over NAV, cash, portfolio positions and general ledger account reconciliations and certain custodial services.

136.    Therefore, in order for PwC to perform an audit in accordance with IFRS, it was required to obtain an understanding of the internal controls not only at the Parent

Funds but also at the Investment Manager (Optimal Investments), the Broker-Dealer/custodian (BMIS), and the Administrator (HSBC Securities).

137.    Optimal Investments, BMIS and HSBC Securities are also considered service organizations.  A service organization is an entity that designs and implements internal controls over financial information on which another entity relies.

138.    ISA (UK and Ireland) Section 402, *Audit Considerations Relating to Entities Using Service Organizations,* governs the audit procedures PwC should have performed on the internal controls designed and implemented by the service organizations at issue here. PwC should have obtained audit evidence that the service organizations' controls were in place and operating effectively by performing one of or several of the following audit procedures:

(a)    testing the Parent Funds' internal controls over the activities of the service organizations;

(b)    testing the controls at the service organizations; and/or

(c)    obtaining the service organizations' auditors' reports on controls placed in operation and the related tests of operating effectiveness.  Such a report is usually referred to as a SAS 70 Report, which would tell PwC whether the tests and results of the service organizations' auditors are relevant to the assertions made in the Parent Funds' financial statements.

139.    In determining if the service organizations' auditors' reports could be relied upon, PwC should have considered the guidance in ISA (UK and Ireland) Section 610, *Considering the Work of Internal Auditing,* and Section 600, *Using the Work of Another Auditor,* which obligates the auditor to make inquiries of the professional qualifications, experience, and resources of the service organizations' auditors (including Madoff's auditor, Friehling &

Horowitz). Such inquiries would have been directed to the AICPA, the IASB, and applicable state society of certified public accountants and other practitioners. In addition, PwC should have obtained a representation from the auditors of the service organizations confirming that they are independent under the requirements of the AICPA or other applicable body, and should have informed the auditors of the service organizations that their reports were being relied upon in PwC's audit of the Parent Funds. PwC also should have ascertained that the auditors of the service organizations were familiar with IFRS or GAAP and had conducted their review of the servicing organizations' internal controls in accordance with IFRS or generally accepted auditing standards ("GAAS").

140.    Additionally, in accordance with ISA (UK and Ireland) Section 600, PwC should have visited the service organizations' auditors to discuss procedures performed and results thereof; reviewed the internal control review programs used by the service organizations' auditors or issued specific instructions outlining work that PwC would have wanted the service organizations' auditors to perform; and reviewed the working papers of the service organizations' auditors.

141.    Had PwC performed these audit procedures as required by IFRS in connection with understanding the Parent Funds' internal accounting and reporting controls it would have discovered, *inter alia*, that the auditor for Madoff and BMIS was unqualified to perform audits or issue reports on the processing of transactions and the related design and effectiveness of internal controls on behalf of Madoff/BMIS as the Broker-Dealer or custodian.

142.    Had PwC performed these audit procedures as required by IFRS it would have led PwC to perform the actual tests of internal accounting and reporting controls at the various service organizations, which would have easily unraveled the fraud.

143.  Indeed, as described below, not only did Optimal SUS not have an internal system for evaluating the veracity of financial returns claimed by Madoff, but the Fund's Investment Manager and Administrator *openly claimed it was not their duty to implement one.* Consequently, these parties were both unable and unwilling to analyze the financial returns claimed by Madoff, or the data available to them to conduct such an analysis. Since Madoff's financial returns were routinely fabricated, it is apparent that none of Defendants conducted any such analysis.

144.  *PwC ignored related party warning signs:* ISA (UK and Ireland) Section 550, *Related Parties,* says that an audit should identify related parties and the auditor should examine and fully understand related party transactions. Under IFRS, parties are considered to be related if one party has the ability to control the other party or to exercise significant influence or joint control over the other party in making financial and operating decisions. IFRS warns the auditor to be aware that the substance of a related-party transaction may be significantly different from its form and that financial statements should recognize the substance of transactions rather than merely their legal form.

145.  In connection with its audits of the Parent Funds, PwC was aware of related party transactions. The most prevalent of these was the concentration of multiple roles in entities controlled by Madoff, which is disclosed in the Memorandum as follows:

> Neither the Fund, Optimal SUS nor the Custodian has actual custody of the assets [of Optimal SUS]. Such actual custody rests with the Broker-Dealer and/or its affiliated broker-dealer. Therefore, there is the risk that the Broker-Dealer could absond with those assets.

146.  In other words, Madoff, as the Broker-Dealer and custodian-in-fact, had been placed in the position of the proverbial fox guarding the henhouse. Had PwC properly analyzed this relationship, it would have been required to amend the nature, timing and extent

of its audit procedures.  But PwC neither obtained an understanding of the business purpose of the relationship nor inspected evidence in possession of the custodian, BMIS.  Had PwC complied with ISA (UK and Ireland) Section 550, it would have easily uncovered the fraud.

147.    Although the related party relationship was disclosed, this disclosure did not negate PwC's responsibility under IFRS to probe further and did not remedy the fact that the financial statements were not prepared in accordance with IFRS.

148.    Additionally, one of the fundamental internal accounting controls is the segregation of non-compatible duties.  Thus, the Broker-Dealer who initiated the security transactions (Madoff) should have been separate from the custodian, who is responsible for the delivery and receipt of securities, the collection of income, and the holding and safekeeping of Optimal SUS' assets.  Had this basic internal control been operating, PwC could have relied on the information received from the custodian as representing a complete record of Optimal SUS' security transactions.  But without the effective operation of this essential internal control, PwC was merely receiving a carbon copy of the information from Madoff as both the Broker-Dealer and the custodian about Optimal SUS' security transactions.

149.    PwC was therefore unable to accomplish the audit objective of determining the completeness and accuracy of the security transactions and the physical security of the resulting positions.

150.    The conflict of interest inherent in the overlapping roles of Madoff and BMIS should have been a warning sign to PwC, yet PwC recklessly disregarded the risk of fraud.

151.    *PwC Relied on Invalid Evidence, Which Was Not Properly Confirmed:* PwC did not verify the assertions in the financial statements with sufficient supporting evidential documentation.  Claims made in Optimal SUS' financial statements about the amount of

purchase and sale transactions, dividends, interest and realized gains and investment assets were not supported by persuasive audit evidence, in violation of ISA (UK and Ireland) Section 500, *Audit Evidence*. Although the particular circumstances of each audit dictate the amount and type of evidence that is persuasive, the general principles regarding evidential matter require the auditor to obtain evidence from independent sources, where there are ineffective internal controls or based on the auditor's direct knowledge. PwC should have known that the audit evidence it was relying on to support its audit reports was insufficient for the following reasons:

(a)     The Santander Defendants and Administrator were incapable of implementing (indeed, had refused to implement) effective monitoring of the Broker-Dealer who initiated, executed, and accounted for the transactions;

(b)     The evidence concerning Optimal SUS' financial performance and transactions was obtained from a custodian (BMIS) who was not independent of the Broker-Dealer (Madoff); and/or

(c)     Evidence was received from unqualified auditors, which PwC would have realized had it obtained SAS 70 reports from the custodian (BMIS) and the Broker-Dealer (Madoff).

152.    PwC's inability to obtain sufficient and competent evidential matter should have caused PwC to extend its audit procedures by assessing the internal controls at the service organizations, which would have directed PwC to discover the fraud or, at the very least, would have caused PwC to issue a disclaimer audit report in light of the limitation of the audit scope.

153.    Pursuant to ISA (UK and Ireland) Section 505, *External Confirmations*, third-party confirmation of amounts included in financial statements is critical for providing

reliability for the purposes of an independent audit. PwC should have obtained evidence directly from third parties about assertions made in the Parent Funds' financial statements, including, among others, the assertions regarding the existence of security purchases and sales, the amounts recorded for dividends, the interest and realized gains, and the investment assets held at year end.

154.    IFRS also caution the auditor that if the third party providing evidence is the custodian of a material amount of his client's assets, the auditor should exercise a heightened degree of professional skepticism. Given that BMIS held 100% of Optimal SUS' assets – and was affiliated with Madoff, the portfolio manager – PwC should have realized that such skepticism was called for. Had PwC applied the appropriate level of scrutiny, it would have discovered the substandard audit evidence it had received to support the amounts recorded in the financial statements for securities transactions, dividends, interest, realized gains and investment assets.

155.    Without an effective confirmation process, PwC failed to comply with IFRS and instead relied on evidence that was in essence generated internally and falsified by a single person who functioned as both Broker-Dealer and, through BMIS, as the custodian.

156.    PwC's audits did not comply with IFRS or GAAS. Had PwC planned and performed proper due diligence, had it not relied excessively on management's representations, had it exercised professional skepticism and due care, and/or had it obtained sufficient evidence about the use of the capital invested with Optimal SUS, then PwC's audits would have uncovered the Optimal Funds' true financial return data and the lack of adequate safeguards in place to protect the investments of Plaintiffs and the Class.

157.   In short, PwC conducted its audits in a reckless manner, ignoring the obvious areas that required further inquiry, which, had they been pursued, would have revealed the fraud that Madoff had been perpetrating.

## COUNT I
### BREACH OF FIDUCIARY DUTY
### (AGAINST ALL DEFENDANTS EXCEPT PWC)

158.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if set forth fully herein.  This Count is asserted against all Defendants except PwC.

159.   Defendants owed fiduciary duties to Plaintiffs and the Class and breached such duties.

160.   The duties expressly assumed by Defendants and owed to Plaintiffs and the Class include, *inter alia*:

(a)   The duty to act with reasonable care to ascertain that the information set forth in the written materials, including the Memorandum, NAVs, quarterly reports, and other presentations communicated to and relied upon by Plaintiffs and the Class in making their investment decisions concerning the Optimal Funds was accurate and did not contain misrepresentations or omissions of material facts.

(b)   The duty to deal fairly and honestly with Plaintiffs and the Class.

(c)   The duty to avoid placing themselves in situations involving a conflict of interest with Plaintiffs and the members of the Class.

(d)   The duty to manage the accounts of Plaintiffs and the members of the Class and to manage, monitor, and operate the investments exclusively for the best interest of Plaintiffs and the members of the Class.

799960.2

(e)    The duty to make recommendations and execute transactions in accordance with the goals, investment objectives, permissible degree of risk, and instructions of Plaintiffs and the members of the Class.

161.    Defendants failed to fulfill their fiduciary duties owed to Plaintiffs and the members of the Class in the following respects:

(a)    Failing to act with reasonable care to ensure that the information set forth in the written materials and other presentations communicated to and relied upon by Plaintiffs and the other members of the Class in making their investment decisions concerning the Optimal Funds was accurate and did not contain misrepresentations or omissions of material facts;

(b)    Failing to act with reasonable care to provide truthful sales information to representatives' agents to ensure that the investment opportunity presented to Plaintiffs and the Class was suitable and in accordance with their investment goals and intentions;

(c)    Engaging in transactions which resulted in a conflict of interest between Defendants and Plaintiffs and the Class whose financial interests Defendants had undertaken to advance, supervise, manage, and protect;

(d)    Profiting and allowing their affiliates to profit at the expense of Plaintiffs and the Class;

(e)    Engaging in transactions that were designed to and did result in a profit to Defendants at the expense of Plaintiffs and the Class; and

(f)    Failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds.

162.    Defendants' breaches of their fiduciary obligations owed to Plaintiffs and the Class show a willful indifference to the rights of Plaintiffs and the Class.

163.    As a proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and the Class have sustained damages and have lost a substantial part of their respective investments, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

164.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Class.

**COUNT II**
**NEGLIGENT MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

165.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This Count is asserted against all Defendants.

166.    Defendants made numerous representations to Plaintiffs and the Class in written materials prior to December 10, 2008, including the Memorandum, marketing materials, account statements, NAVs, and quarterly or annual reports, concerning Defendants' purported due diligence as well as the Optimal Funds' investment strategy and performance.

167.    Defendants knew that the subscriptions in the Optimal Funds were not publicly traded and no other independently verified third-party financial information about them was available to Plaintiffs or the Class other than the Memorandum, marketing materials, quarterly reports, NAVs, unqualified audit reports and audited financial statements.  Defendants knew and intended that the Memorandum, marketing materials, quarterly reports, NAVs, unqualified audit reports and audited financial statements would be the primary sources of information to Plaintiffs and the Class and would be relied upon in making investment decisions

with respect to their investments in the Optimal Funds. Plaintiffs and the Class reasonably and foreseeably did in fact so rely.

168.    Defendants owed to Plaintiffs and the Class a duty: (a) to act with reasonable care in preparing and disseminating the information set forth in written materials, including the Memorandum, periodic account statements, and other representations relied upon by Plaintiffs and the Class in making decisions with respect to their investments in the Optimal Funds; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained therein.

169.    Defendants breached their duties to Plaintiffs and the Class by failing to investigate, confirm, prepare, and review with reasonable care the information contained in the written materials and other representations and by failing to disclose to Plaintiffs and the Class, among other things, the facts alleged above, and in failing to correct the misstatements, omissions, and inaccuracies contained therein.

170.    Defendant PwC knew that its audited financial statement reports would be provided to investors in the Optimal Funds and would be relied on by these investors in making investment decisions concerning subscriptions in the Optimal Funds. The end and aim of the audit engagements was to provide an audit report to these investors, who comprised a discrete and finite group of persons and entities whose identities were known to PwC.

171.    Defendant PwC owed to Plaintiffs and the Class a duty: (a) to act with reasonable care in preparing its audit reports of the financial statements of Optimal Multiadvisors and Optimal Multiadvisors Ireland plc, which financial statements were relied upon by Plaintiffs and the Class in making decisions with respect to their investments in the Optimal Funds; and

(b) to use reasonable diligence in determining the accuracy of the information contained in the financial statements and in preparing the auditors' reports.

172.    Neither the Memorandum nor any other offering material used in soliciting investments in the Optimal Funds, nor any financial statements provided to current investors in the Optimal Funds, ever disclosed (a) that virtually all of the Funds' assets were invested with Madoff, BMIS or other Madoff controlled entities, or (b) that there were inadequate controls in place to ensure that the multiple roles played by Madoff and BMIS were not exploited. Nor did the audited financial statements reveal that the auditors had failed to probe the adequacy of the Optimal Funds' internal controls or the controls established by Madoff and BMIS to ensure the functions of each entity remained separate, or the accuracy of the information received from third parties regarding the Optimal Funds' assets.

173.    As a direct, foreseeable, and proximate result of this negligence, Plaintiffs and the Class have sustained damages and have lost a substantial part of their respective investments, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

174.    By reason of the foregoing, Defendants are jointly and severally liable to Plaintiffs and the Class.

**COUNT III**
**GROSS NEGLIGENCE**
**(AGAINST ALL DEFENDANTS EXCEPT PWC)**

175.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This Count is asserted against all Defendants except PwC.

176.    As investment managers and/or administrators with discretionary control over the assets entrusted to them by Plaintiffs and the Class, Defendants owed Plaintiffs and the

Class a duty to manage and monitor the investments of Plaintiffs and the Class with reasonable care. Defendants breached this duty.

177.    Defendants further breached their duty of care by failing to:

(a)    Take all reasonable steps to ensure that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(b)    Take all reasonable steps to preserve the value of Plaintiffs and the Class's investments;

(c)    Perform all necessary and adequate due diligence; and

(d)    Exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

178.    As a direct and proximate result of Defendants' gross negligence, Plaintiffs and the Class have suffered damages and are entitled to such damages from Defendants, jointly and severally.

## COUNT IV
## UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS EXCEPT PWC)

179.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein. This Count is asserted against all Defendants except PwC.

180.    Defendants financially benefited from their unlawful acts which caused Plaintiffs and the Class to suffer injury and monetary loss.

181.    As a result of the foregoing, it is unjust and inequitable for Defendants to have enriched themselves in this manner, and each defendant should pay its own unjust enrichment to Plaintiffs and the Class.

182.    Plaintiffs and the Class are entitled to the establishment of a constructive trust over the benefits Defendants realized from their unjust enrichment and inequitable conduct.

799960.2                                60

## COUNT V
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (AGAINST PWC)

183.    Plaintiffs incorporate by reference and reallege the paragraphs above. This Count is asserted against PwC.

184.    Defendants owed Plaintiffs and the Class certain fiduciary duties as alleged herein.

185.    By committing the acts alleged herein, Defendants have breached their fiduciary duties owed to Plaintiffs and the Class.

186.    Defendant PwC aided and abetted Defendants in breaching their fiduciary duties owed to Plaintiffs and the Class.  PwC colluded with or aided and abetted Defendants' breaches of fiduciary duties, and was an active and knowing participant in Defendants' breaches of fiduciary duties owed to Plaintiffs and the Class.  Among other things, PwC knowingly or recklessly ignored information that indicated or should have indicated that the money invested by Plaintiffs and the Class in the Optimal Funds was being invested with Madoff and BMIS and that Madoff and BMIS were involved in a Ponzi scheme.

187.    As a proximate result of Defendants' breaches of their fiduciary duties, and PwC's aiding and abetting thereof, Plaintiffs and the Class have sustained damages and have lost a substantial part of their respective investments, together with lost interest and general and incidental damages in an amount yet to be determined, and to be proven at trial.

## COUNT VI
## GROSS PROFESSIONAL NEGLIGENCE
### (AGAINST PWC)

188.    Plaintiffs incorporate each of the foregoing paragraphs as if fully set forth herein.  This Count is asserted against PwC.

189.   PwC's audit reports were specifically addressed and directed to investors in the Optimal Funds, including Plaintiffs and the Class.

190.   Because PwC knew that shares of the Optimal Funds were not publicly traded and no other independently verified third-party financial information about the Optimal Funds was available to Plaintiffs and the Class other than PwC's audit reports and audited financial statements, PwC knew and intended that its NAVs and unqualified audit reports and audited financial statements would be the primary sources of information to Plaintiffs and the Class, and would be relied upon in making investment decisions with respect to their investments in the Optimal Funds.  PwC expected and intended investors in the Optimal Funds to rely on the thoroughness, accuracy, integrity, independence, and overall professional caliber of its audits.

191.   When performing an independent audit of a client's financial statements, a professional certified public accountant is obligated to follow these standards, among others:

(a)     In all matters relating to the performance of the audit, the auditor is obligated to exercise and maintain professional skepticism and an independence in mental attitude;

(b)     Due professional care must be exercised in the performance of the audit and the preparation of the audit report;

(c)     A sufficient understanding of internal control must be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed;

(d)     Sufficient competent evidential matter must be obtained by inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  This includes seeking and obtaining reliable information from independent sources, including third parties; and

(e)    The auditor has the responsibility to plan, supervise and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.

192.    In performing its audits of the Optimal Funds, PwC breached its duty to Plaintiffs and the Class by violating one or more of the aforesaid auditing standards.

193.    As a direct and proximate result of PwC's breach of its duties to them, Plaintiffs and the Class have suffered and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class, demands judgment against Defendants as follows:

A.    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs to be proper Class representatives;

B.    Awarding damages suffered by Plaintiffs and the Class as a result of the wrongs complained of herein, together with appropriate interest.    Plaintiffs and the Class specifically seek the recovery not only of all the principal initially invested in the Optimal Funds, but also all interest and profits which Plaintiffs and the Class would have earned had their money been prudently invested;

C.    Awarding Plaintiffs and the Class punitive damages, where appropriate;

D.    Enjoining Defendants from using the assets of the Parent Funds or the Optimal Funds to defend this action or to otherwise seek indemnification from these funds for their wrongful, reckless, and negligent conduct as alleged herein;

799960.2

E.     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs and the Class's counsel and experts, and reimbursement of expenses; and

F.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  March 25, 2009                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

Steven E. Fineman, Esq. (SF – 8481)
David S. Stellings, Esq. (DSS – 5343)
Daniel P. Chiplock, Esq. (DC – 1137)
250 Hudson Street, 8th Floor
New York, New York  10013
(212) 355-9500

Richard M. Heimann, Esq.
275 Battery Street
30th Floor
San Francisco, California  94111
(415) 956-1000

Attorneys for Plaintiffs